March 29. The Judges delivered their opinions.*
JUDGE CAER.
This case comes up on two Exceptions taken to Opinions of the Court below. William Trigg, being indebted to James C. Anthony between two and three thousand dollars, executed to him a Deed of Trust on twelve negroes as a security for the debt: an advertisement and sale took place under the Deed of trust; and Mark Anthony a brother of James and brother-in-law of Trigg, became the purchaser of all the slaves for the sum of $2,747 SO, overgoing the debt and interest due on the Deed 397 21. The Trustee executed a Bill of Sale to the purchaser, and the slaves were returned to the possession of Trigg, who lived *on a tract of land then rented by the purchaser. The sale took place May 23d, 1812, and the slaves remained with Trigg for the rest of the year. In the beginning of the next year, they were, taken by Anthony from the possession of Trigg, and placed under his own overseer; still, however, on the same plantation where they had lived the last year, which Anthony had again rented, and on which Trigg continued to reside. On the 28th of January, 1813, an Execution issued from the Office of Bedford county, in the name of Pleasant Creery against Trigg, and was levied on one of the slaves bought by Anthony under the Deed of Trust, and then in possession of his overseer. The Sheriff returned, levied and not time to sell; a venditioni issued, and was returned satisfied. Anthony brought trespass against the Sheriff for seizure and sale of the slave. The Defence was placed on the ground of fraud, not in the origin of the transaction, (for, it seems agreed on all hands, that the Deed was fairly executed to secure a just debt,) but in the sale under the Deed. The first effort of the Defendant was to prove, that for some time previous to the sale, Mark Anthony and Trigg were united in a common design to protect the property of Trigg (who was deeply in debt,) from his creditors; that to this end, they in 1811, borrowed of James Austin and John Anthony two bonds, executed by them to Mark Anthony for 4501. each, with the avowed purpose of raising money on them, to relieve Trigg’s negroes from the Deed to J. C. Anthony; that to secure these bonds, they executed a Deed of Trust on Trigg’s slaves, (included in the first Deed,) and on several slaves, &c. of M. Anthony; that a considerable sum of money was raised on the bonds, and that Mark Anthony remitted money to James C. Anthony; but how much was not proved, nor that it was on account of Triggs debt, Mark Anthony being also in debt to J. C. *693 Anthony. That on the day of sale, Mark Anthony appeared as a creditor of James C. Anthony, having an order from him for the whole proceeds of the sale, though he *was, not long before, his debtor. That though the Deed of Trust was made to two Trustees, who were to act jointly, yet when only one appeared on the day of sale, Trigg removed the difficulty, by giving him a written power to proceed alone. These facts being proved, the Defendant offered to examine a witness, to prove that he had attended with tne intention of buying one of the slaves, but was taken out by Trigg, and requested not to bid for them; for, that Mark Anthony was to buy the property for him. This evidence being objected to, the Court sustained the objection, unless it could be shown, that Mark Anthony was privy, or in some way assented, to Trigg’s statement. I think this evidence ought to have been admitted. It is laid down in many cases, that “a community of interest or design, will frequently make the declarations of one, the declarations of all.” (See 2 Stark, on Evid. 44, and the cases there cited.) And this is not confined to contracts, but extends to trespasses, and even crimes of the highest grade. (See Stark, on Evid. 47, and the cases.) In the case before us, the Court had to judge for itself, whether such a community ,of purpose, between Trigg and Anthony, was proved, as laid a proper ground for admitting the declarations of one, to be evidence against the other. I think there was such proof, and therefore, that the evidence should not have been rejected. There is another ground. A transaction consists often of various parts, which, connected together, form the whole. Thus, in the question of fraud, you can hardly ever establish it by direct and positive proof. You must collect the acts, circumstances and declarations of the parties concerned. So far as these form a part, and assist in .giving character to the transaction, they are good evidence. Such facts, declarations, &c. are called part of the res gesta. Thus, when the character of a particular act is questioned, the declaration of the party doing it, made at the moment, is evidence to explain it. As in the case of bankruptcy, the declaration of the bankrupt, made when leaving his house, is evidence to explain the ^meaning of his absenting himself. On the same ground, it was held in Eord George Gordon’s Case, that the cry of the mob might be received as part of the transaction. In these cases, the weight of the evidence does not depend on the credit of the witness, but on its connection with the circumstances. (See 2 Stark, on Evid. 46-7-8.) In the case before us, a public sale of twelve negroes had been advertised to be sold at a certain place in the Town of Lynchburg. This would naturally collect people, and we know from the record, that some did attend besides the immediate parties. Yet, we hear of no bidder but Mark Anthony. It is natural to ask, how this happened? Suppose it could be proved, that there were twenty persons present, and that each of them had been requested by Trigg not to bid, because Mark Anthony was to buy for him. Would not this account for the fact, and go far to give a character to the transaction? Look, too, at the situation of Trigg. He was the owner of the slaves, deeply interested, (if the sale was real,) in raising up bidders, and enhancing the price of every slave. Does not such a man hold an important station in such a transaction? And are not his acts and declarations, done and made at the moment, during the progress of the sale, a very material part of it? The very sale itself would not have been made by one Trustee, without his leave. I think then, on both these grounds, the evidence was clearly admissible. The second exception is, on account of an instruction, given by the Court to the Jury. That was to this effect, that if Trigg had individually sold the slave to Anthony, and had afterwards remained in possession, this would have been fraud per se; but that if the slave was sold by the Trustee, under the Deed, delivered by him to the purchaser Anthony, and a Deed made to him, and afterwards suffered by Anthony to remain in possession of Trigg for the j'ear 1812: This was not per se fraudulent, “so' as to subject said slave to the creditors of Trigg in the year 1813, if then, in the actual possession of Anthony.”
*1 do not consider this instruction as raising the simple question of fraud per se, decided in Edwards v. Har-ben, and many other cases; but, admitting that doctrine as settled, the Court considered this case an exception, and that is the point for our consideration. Eor my view of the general doctrine of fraud per se, I refer to my opinion in the case of Land v. Jeffries, 5 Rand. 211, with the single remark in addition, that I agree fully to the rule of Edwards v. Harben, “That the absolute transfer of personal chattels without a delivery of possession, is in Law fraud per se;” but, I add, that this being a legal presumption, is not aosolutely conclusive as to fraud, but may be explained; and where this explanation is satisfactory to prove the perfect fairness of the transaction, and that the inconsistency of title and possession formed no part of the original contract, the case is taken out of the rule, and I refer to 2 Stark, on Evid. 617-18-19-20, and the cases there, to show that I am supported in this position by that excellent writer, and also by some of the ablest Judges who have sat on the English Bench. Passing the general question by: The opinion of the Court below presents two points interesting and important in their character. 1st. Does the sale of a slave by a Trustee under a Deed of Trust, and a delivery of possession by him to the buyer with a Bill of Sale, so change the property, that the buyer may suffer the slave to return to the possession of the former owner, without danger of coming within the rule of Edwards v. Harben? 2d. If possession of the slave do not accompany and follow the conveyance, but yet the purchaser takes possession before the issuing an Execution by a creditor of the vendor, can such Execution be levied on the property in possession of the pur *694 chaser? I would not be understood to give a decided opinion on either of these points, because I think the cause may be decided without it; but, on the first, (as it was discussed at che Bar, and will, I understand, be noticed by some of my brethern,) I will give my present impressions. In ,Kidd v. Rawlinson, 2 *Bos. & Pull. 59, it is decided, that if A. buy the goods of B., sold by a Sheriff under an Execution, he may suffer them to remain in possession ofB., without subjecting them to B’s creditors. The circumstances distinguishing this from Twyne’s Case, seem, 1st. The publicity of the sale: 2dly. That the purchaser was not a creditor: 3d. That the sale was not by the party himself, but by the Sheriff. “The object of the Statute (as is well observed by Starkie, 2 vol. 620,) was to prevent covinous and fraudulent sales by the owner to the prejudice of creditors, and not, as it seems, to sales made by a third person, as a Sheriff under an Execution, or a Landlord under a Distress, without proof of some fraud or collusion on the part of the owner, which in effect, makes such a sale-his own act.” The case of Guthrie et al. v. Wood, 1 Starkie’s Cases, 367; 2 C. L. R. 430; was shortly this: Eastman a packer, assigned the goods in question to W., as Trustee for H. ; to secure the payment of an annuity sold by E. to H: ■ remaining in possession, he afterwards assigned his counting-house, fixtures, and utensils in trade, to Guthrie and others, for the benefit of his creditors. E. remained in possession of the goods, and Pearson, the Landlord, sent in a Distress for rent, and the goods in question were sbld under the Distress, and purchased by Guthrie with the funds of the creditors, for whom he was Trustee, and for their account. The goods were still suffered to remain in possession of Eastman, and they were seized under an Execution at the suit of W., as Trustee for H., and Guthrie brought trover against Wood, to recover their value. After argument by Scarlet and Spankie, for the Plaintiffs. Marryatt and Comyn, for the Defendant, Lord Ellen-borough said, “I had supposed that evidence would have been given of some collusion on the part of Pearson, the Landlord, with the Plaintiff; but nothing of this kind appears. The Plaintiffs acquired a property in the goods by purchasing them at the sale under the Distress. Guthrie, as a Trustee, was not on that account precluded from ^becoming a purchaser; he purchased them as any other person might have done; and though he had taken the money with which he purchased them from the strong box of another, that would not have vitiated the sale. His motive for buying was. that the goods might not be removed from the premises, but might remain there for the benefit of the creditors, and he was quite at liberty, if he chose, to leave Eastman in the possession. The doctrine of possession applies to cases of conveyance from the party himself. The Statute of Eliz. does not apply to a case like this, where the property is sold not by the party, but under a Distress forrent.” See also, Meggot v. Mills, 1 Lord Raym. 286; Cole v. Davies, Id. 724 ; Watkins v. Birch, 4 Taunt. 823; Steel v. Brown, 1 Taunt. 381. These are most of them cases under Executions, or Distress, warrants, but the following comes nearer to the question before us. Leonard v. Baker, 1 Mau. & Sel. 251: One Olee, the husband of the Plaintiff’s mother, assigned his effects to Trustees for the benefit of creditors, and absconded, leaving his wife in possession of his house, and goods at Pershore, and notice of such assignment was advertised in the newspaper, and the goods were afterwards sold by the Trustees, at public auction; and the Plaintiff purchased them in order to accommodate his mother, and paid for them at a fair valuation, and removed some, but left the greater part in her possession, she continuing to reside in the house, and take in lodgers as. before, and at the ensuing Michaelmas, he also took the house of the Landlord, at an advanced rent. In the December following Collin’s Execution was levied on the goods, when the Plaintiff gave notice to the Sheriff, that the goods were his property, under the appraisement and sale, which was the first time that Collins was apprised of that circumstance. The Plaintiff brought Trover against the Sheriff. The Judge at Nisi Prius, left it to the Jury to consider: 1st. Whether the change of property by the assignment, and subsequent sale made to the Plaintiff, was notorious at Per-shore; upon *which the Jury found in the affirmative: And2dly. Whether the assignment had been executed with an intent to defeat either the general body of creditors, or any particular creditor: The Jury found in the negative, whereupon, a verdict was found for the Plaintiff.
Jervis moved to set aside the verdict, and enter a non-suit, on the ground that it was improperly left to the Jury to say, whether the change of property was notorious, there being no evidence of any change of property at all; inasmuch as Clee’s wife was suffered to continue in possession of the goods, after the assignment to the Trustees, and after the sale to the Plaintiff, precisely in the same manner as before. The Court were unanimous against the motion. Lord Ellenborough said, “I think the verdict is according to the law and the facts, as they appeared to the Jury. As to the point respecting the change of property; what was done respecting it, was not done secretly, but the Trust Deed was known and advertised in the public papers; and the sale under it was by public auction. The Trustees, indeed, for a time allow the wife to continue in possession after the assignment; and do not themselves interfere with the goods by removing them, except on occasion of the man’s coming in and taking away the saw; which, however, is a circumstance in the case, although I dn not much rely upon it; but when the sale took place, the Plaintiff removed a part of the goods, and the rest only he suffered to remain with his mother for her accommodation. At all events, an effectual change took place in September, when the house was re-taken by the Plaintiff, at an advanced rent; but it seems to me, there was a bona fide change befoie that time: to hold otherwise would be to- *695 pronounce that a person could not make a bona fide purchase of goods in the possession of another for his accommodation, and for the purpose of continuing them in the same possession.” This seems to me a very strong case, and accords with my ideas of sound reason, and the meaning of the Statute. Where a fair, open, public sale of a man’s property is made *by a third person, whether as Sheriff, Bailiff or Trustee, it never could be the intention of the Statute to prevent a friend from buying as the highest bidder, paying his money, and then leaving the property with the former owner. Deeds of Trust, with us, “take effect as to subsequent purchasers for valuable consideration, without notice, and as to all creditors, from the time when such Deeds shall have been acknowledged, proved, or certified according to Daw, and delivered to the Clerk of the proper county to be recorded,” and this Court has, in many cases, laid it down that the Trustee is the agent of both parties: leaving, therefore, the questions of fraud and collusion to depend on the evidence, and to be decided by the Jury in each particular case, I think that as a general question of Law, we may pronounce, that a fair sale, under a fair Deed of Trust, does so change the property, that the purchaser may permit it to return to, and remain with the former owner, without subjecting it to be taken for his debts, unless it be suffered to remain with him more than five years.
I have thus given my opinion on these questions, taking them in the point of view in which they were passed upon by the Court below, and discussed at the Bar here. But, there is an aspect of the case which seems to me conclusive, and renders all the points made, and the Opinions given in the Court below, immaterial and irrelevant. The Deed of Trust from Trigg to James C. Anthony, seems agreed on all hands to have been fairly executed, to secure a just debt. In Shep. Touch. 67; Estwick v. Caillaud, 5 Term Rep. 425, and other cases, it is said, “that the question whether a Deed be legal or not, depends on the intention of the parties, at the time when it was executed: and that when a conveyance is not fraudulent at the' time of making it, it shall never be said to be fraudulent for any matter ex post facto.” Now, the sale was either fair, and must stand good, or it was fraudulent and void; if good, the Sheriff of course was a trespasser, in taking the property. But how, if it was void? Why then it seems to *me, that being a mere nullity, it leaves the Deed of Trust in full force and vigor. I do not mean to say, that as to Trigg, the sale is a nullity; for, though fraudulent, it would be binding on him : he could not be heard to impeach it. But. putting the sale out of the way of creditors, would not the Deed of Trust still operate to shield the property from their Executions? That property is fast bound for the debt of James C. Anthony. If, after a fair application of it to that debt, any surplus should remain, this would be a fund to which the creditors of Trigg ought to have resort, and could have resort: but it cannot be reached by Execution, for it is an equitable and contingent interest.
I think, therefore, that whether the sale were good or bad, the slave was not liable to Execution, and the Sheriff was a trespasser; that, in this point of view, the Opinions of the Court furnish no ground for reversing the Judgment, and that it must be affirmed.
JUDGE GREEN.
The Appellee brought this action against the Appellant, a Sheriff, who levied an Execution against Trigg on, and sold, a slave, which the Plaintiff alleges belongs to him. The Plaintiff claimed the slave, as a purchaser of that and other slaves from a Trustee to whom Trigg, the brother-in-law of the Appellee, had conveyed them, for securing a debt to James C. Anthony, a brother of the Appellee. The slave conveyed, had remained until the day of sale in the possession of Trigg, who lived on a tract of land rented by the Appellee. At the sale on the 21st May, 1812, the Appellee purchased all the slaves embraced in the Deed of Trust, at a sum a little short of the amount of the debt for which they were pledged, but paid no money; James C. Anthony having given an order, directing the money to be paid to the Appellee. After the sale, the slaves returned to. the possession of Trigg, who kept them in his possession until the end of the year 1812, when they -were put under an overseer, employed by the Appellee to manage the plantation on which Trigg resided, and still continued to reside, when the Sheriff levied the Execution on the slave in question, it being the same plantation before rented by the Appellee, and which he had rented for the year 1813. The negro was taken by the Sheriff from the possession of the overseer early in 1813, but it does not appear when the Execution was issued, or delivered to the Sheriff, or levied. The Appellee had procured, before the sale by the Trustee, the bond of another person, for the avowed purpose of raising money to pay Trigg’s debt to James C. Anthony; and he and Trigg gave a Deed of Trust upon the slaves of Trigg embraced in the former Deed of Trust, and upon some of the Appellee’s property, to indemrif3’ the person who had given his bond to the Appellee. Money was raised upon this bond, to what amount does not appear, and money was remitted by the Appellee to James C. Anthony, but to what amount does not appear, he being also indebted to James C. Anthony. All this was done before the sale by the Trustee. The Appellee paid the amount of the bond which he had borrowed, to the holder. On the day of sale under the Deed of Trust, one only of two joint Trustees named in the Deed being present, Trigg gave his consent in writing, that the single Trustee should make the sale, in the absence of the other. Evidence was given of this fact, and that Trigg was much in debt. The Defendant offered to prove by a witness, that he attended the sale under the Deed of Trust, in tending to purchase some of the negroes, but was prevented from bidding by Trigg’s telling him, that the Plaintiff *696 was purchasing them for him. This evidence was rejected by the Court as inadmissible, to which the Defendant excepted.
Whenever the question, whether any evidence offered is, or is not admissible, depends on other facts already proved, the Court, whose province it is to decide the question as to its admissibility, must of necessity judge and determine *the effect of the evidence ordered to prove the fact upon which that question depends.
In this case, I think it clear that the Appellee and Trigg acted in concert for the purpose of erecting a common object. Whether the fair and honest object of disposing of the trust property, for the purpose of satisfying his debt to James C. Anthony, and consequently, to deprive Trigg of all interest in the property disposed of for that purpose; or, under colour of a sale, to defeat the just claim of Trigg’s creditors, to have satisfaction of their debts out of the surplus of the trust property, after a fair disposition of so much of it as might be necessary to satisfy the debt for which it was pledged, by procuring a feigned sale of the whole for the amount of the debt, and securing the whole of it to the use of Trigg, subject only as before, to the payment of the original debt, or so much of it as was really due, thus really preserving, whilst apparently extinguishing, Trigg’s interest in the property. These were questions for the Jury, to be determined upon the weight they might give to the facts, if they were proved to their satisfaction, .namely, the pecuniary embarrassments of Trigg, the connection of the parties concerned, the promotion of the sale by the voluntaiy act of Trigg, which resulted apparently in the total loss of all his interest in the property, whilst he still continued to enjoy it, and that no money was paid on the sale; and upon the fact, if the evidence offered to prove it was admissible, and credited, that he interposed to prevent the property from selling for a better price. In order to determine whether this evidence was or was not admissible, it devolved on the Court to determine, for itself, not for the Jury, whether the other facts were sufficiently proved, and whether these facts were prima facie sufficient proof, that the parties had combined to effect the fraudulent design of defeating the rights of Trigg’s creditors in the manner above stated. And if so, then the proof of Trigg’s interposition to prevent a real sale to a stranger to these contrivances, was admissible “'evidence against the Appellee, not because it was necessary, in order to satisfy the Court as to the fraudulent design of the transaction, of which the Jury was finally to judge, bufas fit evidence to be considered by the Jury, in fdrming their judgment upon the whole case. Nor is this an improper interference, on the part of the Court, with the province of the Jury, but the necessary effect of the constitution of our Judicial Tribunals, consisting of Courts and Juries. It is well settled, that in the case of several combining for an illegal purpose, the acts and declarations of each in respect to the common object, are evidence against the others; yet, before such evidence can be admitted, the Court must decide for itself, that there is sufficient evidence prima facie, to prove such a combination, which the Jury may nevertheless negative. 2 Stark, on Evid. 44, 47: Rex v. Inhabitants of Hardwick, 11 East. 584; Rex v. Stone, 6 Term Rep. 527; Phillips’ Law of Ev. 71-2-3.
If it were otherwise relevant to the issue, this evidence ought, I think, to have been admitted, not to prove that in truth the purchase was made for Trigg, but as proof of his act, tending to prevent a competition in the sale, from which the fraudulent intent aforesaid might be inferred.
' The enquiry as to the propriety of the instruction given by the Court, presents the question, as to the doctrine of fraud per se, a few years since thought to be conclusively settled by an uniform course of decisions in England, and in the Supreme Court of the U. S., and now thought (as seems to me without good reason,) to be entirely unsettled and doubtful. This doctrine is deeply founded in the early principles of the Common Law, and declared and enforced by many ancient Statutes. It proceeds on the ground, that a possession and use of the property professedly transferred to another, inconsistent with the professed object of the transaction. is conclusive proof of a secret trust for the original owner, and therefore fraudulent as to his creditors, and liable to their Executions.
*As early as the 1st of Rich. 3, provisions were made by a Statute intended to protect purchasers against secret Uses, now called Trusts. This was effected by declaring that the conveyance of the cestui qui trust, whether the use were secret or open, should pass the legal title as against the Feoffee to the use, and all claiming under him, subsequent to the disposition of the property by the cestui qui use.
The Statute of 3 Hen. 7, ch. 4, enacts, that “all Deeds of Gift of goods and chattels, made in trust to the use of the grantor, to defraud creditors, shall be void.” 13 Vin. Abr. 517, pi. 1. The Statute of 50 Edward 3, ch. 6, provided, that “fraudulent assurances of lands, or goods, to der ceive creditors, shall be void, and they may have Execution thereof, as if no such gift had been made.” This Statute was the first in order, and applied only to debtors who fled to Sanctuaries. That of Rich. 3, applied only to land, and chattels real, conveyed to the use of the grantor, and that of Hen. 7, only to the case of goods and chattels conveyed by the grantor, in trust for himself. These Statutes applying only to particular cases, the 13th of Elizabeth was enacted, in terms which embraced all conveyances, suits, bonds, judgments, and executions, intended to defraud creditors, and avoided them as to the creditors thereby defrauded, and this Statute wé have introduced into our Code. These Statutes against Fraud have always been held to be declaratory of the Common Law, with this difference, that at Common Law, no one could complain of any fraud, unless he had an existing right when the fraud *697 was committed, which was prejudiced by it; whereas, the Statutes enabled any subsequent creditor to impeach the fraudulent transaction, if there were any other creditor at the time, who might be defrauded by it. 3 Co. Rep. 82-3, Twyne’s Case.
It is observable, that two of these Statutes were pointed particularly to the cases of frauds practised by means of secret trusts; the most ready expedient, and most commonly resorted to, for perpetrating frauds, indeed almost *the only one. The real object of those transactions being, in general to preserve the property, for the benefit of the debtor, against the claims of his creditors, by representing it as belonging to another, whilst he enjoys the use of it: accordingly, the Courts must have considered the continued possession, and use ot the property, by the debtor, notwithstanding an absolute transfer in form to another, as a proof of a secret trust, and therefore fraudulent and void, as to creditors, under the Statutes of Rich. 3, and Hen. 7, as a fortiori, under that of 13 Bliss., and also by the Common Raw. So confirmed was this doctrine iri the time of Elizabeth, that in Twyne’s Case, it was treated as a settled doctrine, that wherever there was any trust for the donor, there was fraud against creditors, and that possession by the donor was considered as conclusive evidence of fraud. A gift to a child, was considered as fraudulent and void, not because it was voluntary, and without valuable consideration, but because a trust was inferred, that the “child, in consideration of the gift being voluntarily and freely given to him, and also in consideration of- nature, would relieve his father, and not see him want, who had made such a gift to him.” Indeed the drift of the argument in that case, is not to show that a secret trust avoids the transfer of the property, as being conclusive evidence of fraud, but taking that for granted, to show that if there is any trust whatever, express or implied, (the distinction between which is carefully explained,) the conveyance does not come within the proviso of the Statute, which excepts from its operation bona fide convev-ances only. One of the reasons for the Judgment in that case, was, “Here was a trust between the parties, for the donor possessed all, and used them as his own proper goods;” and “every gift made on a trust, is out of this proviso, for that which between donor and donee is called a trust, per nomen speciosum, is in truth, as to all the creditors, a fraud,” and “the continuance of the possession in the donor, is a sign of trust.”
*'Erom the manner in which the subject is treated in this case, and the terms of the Statute of Hen. 7, I should think that the decision was founded upon a long and well-settled doctrine, that a continued possession, inconsistent with the professed purpose of the transaction, was a fraud per se, that is, conclusive evidence of a trust, and therefore, a fraud. However this may be, this doctrine, which is called the rule of Edwards v. Harben, comparatively a very modern case, has never been questioned in England, or here, until very recently. This was the doctrine held in Stone v. Grubham, 2 Buist. 226; in 12 Jas. 1; and Hungerford v. Earle, 2 Vern. 262, in 1692, and in Bucknall v. Roiston, Ch. Prec. 287, in 1709. In the latter case, Sir Edward Northey said, that it had been ruled so forty times, in his experience at Guildhall. This was also the doctrine in the Supreme Court of the U. S., in Hamilton v. Russell, 1 Cranch. 310, and has been repeatedly affirmed in this Court, without exception or reserve. Fitzhugh v. Anderson, 2 H. & M. 303; Alexander v. Deneale, 2 Munf. 341; Robertson v. Ewell, 3 Munf. 1; Thomas v. Soper, 5 Munf. 28; Williamson v. Parley, Gilm. 15. The decisions elsewhere, which are supposed to be modifications of, or exceptions to, this rule, are not so. In all those cases, the possession was not inconsistent with the professed purposes of the transaction, as if the sale be conditional, or the situation of the parties or property be such, as that it cannot be conveniently delivered to the purchaser, so it be delivered as soon as it conveniently can ; or, it is avowedly pledged as a security for the payment of debts, by being conveyed to Trustees for that purpose; in all of these, and such like cases, the possession is not inconsistent, and the character of fraud is not necessarily stamped upon it. This rule is so fortified by the most venerable authority, and so well-founded in justice, and sound policy, that I should be very reluctant to depart from it lightly, or to fritter it away by refined distinctions.
*Theonly circumstances which can be alleged as taking this case out of the rule, are, that the legal title to the slaves was in the Trustee, who transferred it to the Appellee; that a large sum of money, secured by the Deed of Trust, was really due, either to James C. Anthony, or to the Appellee, if he had paid it to James C. Anthony, and that the Appellee had taken possession of the property before the Execution was levied. The circumstances, that there was a real debt due from Trigg, is of no consequence in itself; for, if a true creditor uses his debt in any way to cover the property of his debtor, and protect it from his other creditors, and with that intent, his title is void for fraud, so far as other creditors are impeded by it; as if a creditor, who has an Execution levied on the property of his debtor, directs the Sheriff not to sell it, but to leave it in the debtor’s possession, a trust is implied as a matter of law, his Execution is fraudulent, and any other creditor may take the property in execution. 13 Vin. Abr. 524, pi. 3. In Twyne’s Case, there was a real debt due to the purchaser of the debtor’s property, and the Court said that it was not within the proviso of the 13th Elizabeth, which excepts conveyances made bona fide, and upon good consideration, “for, although it is on a true and good consideration, yet it is not bona fide, for no gift shall be deemed bona fide within the said proviso, which is accompanied with any trust; as if a man be indebted to five several persons, in the several sums of 201., and hath goods of the value of 201., and makes a gift of all his goods to one of them in satisfaction of his *698 debt, but there is. a trust between them, that the donee shall deal favorably with him, in regard of his poor estate, either to permit the donor, or some other for him, or for his benefit, to use, or have possession of them, and is contended that he shall pay him his debt when he is able; this shall not be called bona fide within the said proviso.”
Nor does the fact, that the Appellee had taken possession of the property, before the Execution was levied, prevent *the operation or application of the rule. That being founded upon the legal inference, from the continued possession, that there was a secret trust between the parties for the benefit of the debtor, it attaches upon all cases in which the possession has ’ continued beyond the time, when the property might convenient!}’ have been delivered to the purchaser, and the possession of the purchaser after the presumption of Law is fixed upon the transaction, cannot impair the force of that presumption. Accordingly in Edwards v. Harben, the rule was applied to the purchaser, as Executor de son tort, taking possession after the death of the debtor, who had continued in the possession only a. few days after the sale. If the possession of the debtor be such, as that, during that possession, a creditor might have taken the property in Execution upon the ground that such possession made,the conveyance fraudulent per se, and void in its inception, the change of possession could not make that good which was already void, and a creditor may take in Execution property fraudulently conveyed, and in possession of the fraudulent donee.
The remaining question, as to the effect of the Deed of Trust, which was valid in its inception, is important, and in respect to which, so far as I am.informed. we have no satisfactory precendents. I do not mean the question, whether a sale under a Deed of Trust is, as a sale under an Execution, exempted from the operation of the rule of Edwards v. Harben; but the question, whether applying that rule, and finding that the sale under the Deed of Trust was fraudulent, it should be held that the property is liable to creditors, as if the Deed had never been made: or, vacating the sale only the creditor should be restored only to his original right to have satisfaction out of the surplus of the property left, after satisfying the debt for which it was pledged.
In the case of Hungerford v. Earle, 2 Vern. 261, (in 1692,) Commissioner Hatchins held, that a Deed not at first fraudulent may afterwards become so, by being concealed, *or not pursued, by which means creditors are drawn in to lend their money. No Decree was, however, pronounced, but an issue was directed to try the question of fraud, the event of which is no where reported. This dictum is approved by Chancellor Kent (whose opinions ate entitled to great respect,) in Hildreth v. Sands, 2 John. Ch. Rep. 35. On the other hand, it was held in Stone v. Grubham, in 1615, before cited, and in 1 Dews v. Brandt, Select Ch. Cases, 7, in the 11th year of George the first, by Raymond and Gilbert, Commissioners, that a Deed not fraudulent in its inception, could not become so by matter subsequent. And in this opinion I agree. The very terms of the Statute require that the conveyance, or security,' shall, to render it void, be had or made with intent to defraud creditors or purchasers. Although a Deed valid in its inception is not rendered void at Law under the Statute, by using it for a fraudulent purpose, yet a Court of Equity, acting upon its general principles, would put it out of the way of a creditor, or purchaser, so far, if that wére entirely, as might be necessary to put the party affected by it iñ. the same situation in which he would have been but for the fraud.
I should consider the continued possession of Trigg in this case, as per se, making the sale under the Deed of Trust fraudulent and void, so far as it affected his interest in the trust property which was intended to be withdrawn, under colour of that sale, from the just claims of his creditors; a sale under a Deed of Trust, when no money is paid, being different in principle from a sale under Execution where the money is paid; the public officer performing his duty according to Law, and the trustee acting as the agent of both debtor aud creditor, according to their directions, if they concur in them, as in this case they did. Other views, however, render it unnecessary to pursue this branch of the subject.
The Deed of Trust being valid, although used for a fraudulent purpose, and the sale under the Deed of Trust being ^fraudulent, and therefore void as to creditors, but good as between the parties, the case in effect is that of a mortgagee of personal property in possession, the mortgagor having an interest in it, to the extent of the surplus which may remain after payment of the debt, liable to his creditors in some form. And the question is, whether sufch interest is the subject of an Execution upon a Judgment at Law.
The 30th section of our Statute of Conveyances, provides, that estates of every kind holden or possessed in trust, shall be subject to tha debts and charges of the cestui qui trust in like manner, as if he owned the interest in the things so holden or possessed, as he owns in the uses or trusts thereof. This provision embraces those of the Statute of Richards, before referred to, and of the 10th section of the Statute of Frauds of the 29th Charles 2, combined, in respect to lands and chattels real, to which only they extend. A conveyance of personal property, or chattels real, by the legal owner, in which there is any trust for the owner, is void as to creditors, under the Statutes of Hen. 7, and 13th Eliz.. and by ,the Common Law; but, personal property conveyed by a third person in trust for a debtor) or by a debtor in trust for the payment of debts, is -not in Englahd liable to an Execution on a Judgment against the cestui qui trust, either by force of any of those Statutes, or by the Common Law as has been there decided.
Our Statute, I think, goes further, and *699 provides for this case. The terms, “estates of every kind, holden or possessed in trust;” “the things holden or possessed,” which are not found in the Statute of Rich. 3, and Chas. 2, were I think, intended to embrace all possible descriptions of property, real and personal: and this construction is strongly fortified by the fact, that the Statute concerning joint rights and obligations, prepared by the same Revisors who prepared this Act, has the same expression, (“the estates or things holden, or possessed,”) applied clearly by the context to personal property. But, still it can apply to no *case where the cestui qui trust has not an immediate equitable right to the possession and enjoyment of the property; for, if it were a remainder, or contingent, as such a right, if legal, would not be subject to Execution until it fell into possession, so neither would such a trust. Trigg, having no immediate right, and none until the debt for which the property was pledged was satisfied, and the surplus ascertained, the Sheriff had no legal authority to take it from the possession of the Appellee, and was a trespasser. In this view, the evidence of Trigg’s interposition to prevent competition, bad no tendency to justify the levying of the Execution on the slave, and was therefore properly rejected, it being irrelevant to the matter in issue. And for the same reason, and not for those assigned by the Court, the instructions excepted to, declaring that in a certain state of facts, the sale would not be fraudulent per se, afford no ground for reversing the Judgment, since each of them was qualified by the expression “so as to subject the said slave to the creditors of the said Trigg,” which was true. The creditor, whose Execution was levied on this slave, mistook his remedy. That was in a Court of Chancery, to have the debt due on the Deed of Trust ascertained, the property sold, the debt paid, and the balance, if any, applied towards the satisfaction of his Execution.
The Judgment should be affirmed.
JUDGE COAETER.
There are two Bills of Exceptions: one as to the rejection of evidence offered by the Appellant; the other in regard to an instruction as to the Law, given by the Court to the Jury. They both have reference to the same statement of facts, and I will consider the last first.
The Bill of Exceptions give a summary of what was proved before the Jury, from which it appears that one Trigg, being indebted to James C. Anthony, in the sum *of $2,680 29, executed a Deed of Trust on sundry slaves ; that Mark Anthony, the Appellee, and who was brother-in-law of Trigg, was also indebted to James C. Anthony; that wishing to assist he procured James Austin and John Anthony, to execute two bonds; one for 4501., payable the 19th January, 1812, and the other for 4501., payable the 19th January, 1813. The object, it seems, was to sell those bonds, and pay off the Deed of Trust. Trigg and Mark Anthony executed a Deed of Trust, to save harmless Austin and John Anthony, as to the bonds so given by them. In this Deed was comprised the slaves in the Deed of Trust to James C. Anthony, and also some slaves and lands belonging to Mark Anthony. A considerable sum, it appears, was raised on the bonds, but what amount was not proved; and about the time, Mark Anthony made considerable payments, but to what amount does not appear, to James C. Anthony, in his own name. No credit appears to have been entered on the Deed of Trust. These bonds were executed on the 26th August, 1811: when the money was raised on them, does not appear.
On the 23d May, 1812, William Mitchell, one of the Trustees in James C. Anthony’s Deed, with the assent of Trigg, advertised and sold the slaves in that Deed, and Mark Anthony became the purchaser, received possession, and a Bill of Sale from the Trustee. The slaves were thereupon returned to the plantation of the Appellee, whereon Trigg lived, being a plantation which the Appellee had rented for the years 1811, 1812, and 1813; and it is stated, that it did not appear that Trigg interfered at all with the negroes. It was also proved, that in the year 1813, the Appellee employed an overseer for the said plantation, and placed under him the slaves purchased by him as aforesaid, and that none of them were subject to the control of Trigg, but were entirely under the control of the Appellee and his overseer, from whose possession one of them was taken under Execution as the property of *Trigg; and for which alleged trespass this action is brought. The Execution bears date on the 28th January, 1813; but when it came to the possession of the Sheriff, or was levied, does not appear.
There is no proof whatever, nor any ground whereon to raise a suspicion, that this plantation was rented for Trigg, and that he was the real owner of the lease. On the contrary, it seems that he had not at any time any control over it, or the slaves on it, and that he certainly had none during the year 1813. There seems to have been no question raised, but that the overseer, from whose possession the slave was taken, was there during the whole of the year 1813; and of course, that he was so in possession when the Execution issued. It was clearly so understood by the Judge, and no dispute at all raised on that point. Whatever might have been the case, then, in 1812, the purchaser clearly had possession during the whole of the year 1813, and of course before the Execution issued. I think the Judge was right in his instruction given as to the Law on this state of the facts. But, this was a public sale, under the deed of Trust, by one having the legal title; and who, Trigg having assented to dispense with the presence of the other Trustee, was authorized by that assent, and the terms of the Deed, to make the sale. He did so, delivered possession, and conveyed the legal title from him, so far as he could convey it. As at present advised, I am unable to distinguish such a case as this from a sale under execution, or for rent; and if the purchaser in such latter case might permit the former *700 proprietor to remian in possession, without being subject to the doctrine of fraud per se, I cannot see why he might not in this case.
It is true, a sale under a Deed of Trust, or even under an Execution, may be a mere cover to a fraudulent and secret trust for the benefit of the alleged debtor; but, such open and public transactions as these, are not, it seems to me, within the operation of the rule aforesaid. I therefore think, at present, that the Judge was right in the *other branch of his instruction ; and that such possession as was proved to be in Trigg in 1812, was only a circumstance which might avail with others to prove actual fraud in the transaction ; and was, therefore, properly left to the Jury for that purpose, and that only. This alleged actual fraud the Jury negative by their verdict.
But, the other Bill of Exceptions shews, that evidence going to prove actual fraud, and combination to defeat creditors, was rejected, and the question is, was the testimony offered, properly rejected or not?
In considering this point, it seems to me that James C. Anthony must be taken to be a bona fide creditor of Trigg to the amount of $2,650 29, for the payment of which the sale was made.
The Plaintiff was his agent, and receiver of this money on the day of sale, and became the purchaser of the property. It would seem that Trigg was his debtor also, on account of the transactions in relation to the bonds which were sold as aforesaid, and which the Appellee has since paid off in the hands of the holders.
The property incumbered. by Trigg to James C. Anthony, and which was sold as aforesaid, was the only property which stood between the Appellee and harm, and he may be considered a second incumbrance on it, for his indemnity. He received the amount the bonds sold for, but he was to take in those bonds or his estate would suffer. The incumbered property of Trigg was to be applied first to take them in. If it proved insufficient, he would lose the difference between what the bonds were sold for, and what he had to pay for them. It was natural, and proper.then, for him to get himself into such a situation, that he could bid at the sale without having to advance the money, to the full extent of the first incumbrance, so as to purchase in, and make his second incumbrance ' cover whatever the slaves might be worth, to have what they would sell for in cash. He could have bid up under the second incumbrance too, so as to save *his own property so far harmless in regard to the bonds, and the Deed of Trust aforesaid.
Had he been in no wise connected with Trigg, this course would have tended to produce the best possible sale. It was the natural and proper course, according to the evidence, had he been a stranger. But, he was the brother-in-law of Trigg, in addition to which he had permitted Trigg to live on his plantation, and Trigg had agreed that one Trustee might proceed to sell. If, in addition to this,' it had appeared hat the negroes were worth more in cash than both the incumbrances, and that if he could get them in, without paying more for them, he might aid Trigg in future, there would be some ground to suspect that in fact it had been agreed, that if he could so get them in, he would hold them for his benefit, to the extent that their real value exceeded both debts.
Had there been proof then, of the amount the bonds sold for, so as to show what was the extent of both debts, and that the real cash' value of the slaves exceeded that amount to any considerable extent so as to make a project of this kind really available to him, the near connection, and friendship between the parties might have led tó a suspicion of such combination. But, neither the extent of the debts, nor the real cash value of the slaves is proved. They seem to have been set up singly, except one family, and sold for considerable prices. And it does not appear but that they were sold for full prices: nothing appears to the contrary. They may have sold for more than they could have been sold for, had not the Appellee had it in his power to bid to the extent of the debts aforesaid. There is no unfairness of conduct imputed to the Trustee. He knew of no fraud or combination, but sold for as much as he could get.
If, however, there was in reality nothing due on those Deeds of Trust; if they have been merely used as a cover, to enable the Appellee to purchase in this property, and cover it for Trigg, creditors might have enquired into it *on a bill for that purpose, or perhaps might have proved it in this suit; but,.there being no proof of fraud or combination, we ought not to suspect it, merely on the ground of the connexion subsisting between the parties. Acts of benevolence from one connexion towards another ought not to be repressed, for fear of imputations of this kind, unless they can be supported by pregnant circumstances.
Under this state of the evidence, William Eeftwich is introduced to prove, “that he attended the sale under the Deed of Trust, with intent to purchase one of the slaves; that he was taken out by Trigg, who requested him not to bid for the slaves, stating that the Appellee was to buy the property for him, the said Trigg.” This evidence was rejected, unless it could be shown, that the Appellee was privy to Trigg’s statement, or in other manner consented to it.
The witness deos not even state, that he forbore to bid, if that would have made any difference, or that this was generally understood, and the biddings repressed; or that the Trustee knew or suspected it, or that the slave he intended to bid for, or any other slave, was sold for less than he would have been willing to give.
This evidence was offered as the declaration of one of two confederates in an unlawful act; but, before such evidence can be given, there must be proof of the confederacy, of which proof the Court is to judge. The declarations of a third party not on oath, are not evidence, until by some legal evidence the combination is proved. That cannot be proved by declarations not on oath, in order to let in those very decla *701 rations as proof before the Jury. Neither Court nor Jury are to hear such declarations, until a foundation is laid for their introduction. Here, the only evidence of fraud or combination is the say so of Trigg. This I think was properly rejected.
The Judgment must be affirmed.
*JUDGE CABRLD.
The Deed of Trust executed by William Trigg, for securing the debt due by him to James C. Anthony, left in Trigg an equitable and contingent interest in the property conveyed by the Deed of Trust: and such an interest is not liable to execution. The opinions given by the Judge during the progress of the cause, could not, therefore, even if they be erroneous, (as to which, however, I express no opinion,) furnish any ground for reversing the Judgment.
In the case of Land v. Jeffries, (See Appendix to 5th Rand. p. 599,) I bad occasion to express, at large my opinions on what is commonly called “the rule of fraud per se;” as also on the exceptions to it. It cannot be necessary to repeat them here.

The President absent.

For monographic note on Handwriting, see end of case.